McKinney, J.,
delivered the opinion of the Court.
This was an action on the case, brought by Elliott, to recover damages for an injury to his person, while in the employ of the company. Judgment was rendered in his favor for two thousand dollars.
It appears that Elliott had been employed by the company, at thirty dollars per month, as a hand on a-locomotive engine, known as the “ Cumberland;” and his business was to pass wood from the tender to the fireman. This engine was kept and used for the purpose of pushing freight trains up the Cumberland mountain, at the tunnel, the grade on both sides being very heavy. On that part of the road on which this extra service was rendered, there was a curved embankment, of some twelve or fourteen hundred feet in length; and a breach having been made in the embankment by a flood, a trestle-frame bridge was placed therein, of some one hundred and fifty feet in length. The bridge, it seems, was placed some little distance out of the old track: in conseqence of which,' especially at one end, the curve “was made harder,” and perhaps, more difficult for trains to pass from the embankment on to the bridge. Shortly after the completion of the bridge, the engine “Cumberland,” in pushing a freight train, immediately after getting on the bridge, run off the track and fell over, killing the fireman, and inflicting injuries upon Elliott, by which he is, to some extent, disabled for life.
*614 Two grounds of recovery were assumed: First, that the injury was occasioned by the imperfect construction of the bridge: And, secondly, that the engine, from its construction, was not adapted to run safely in a curve.
The “Cumberland” was what is called “an eight wheel connected engine,” without trucks, weighing nearly thirty tons. The weight of the proof is, that it was a first class and perfect engine of its kind. But, there is some conflict in the proof, as to its adaptedness to the particular purposes for which it was used. ■ The proof is satisfactory, on the one hand, that an engine of this construction is peculiarly suited for heavy freight trains, where there are high grades to be overcome, because of the greater adhesion, of the wheels to the iron rails; and because, likewise, such an engine can be run backwards with as much ease and safety as forwards; and that, in both these respects, it has greatly the advantage of a four wheel engine, with trucks. But, on the other hand, the weight of the proof seems to be, that the latter kind of engine is safer and better adapted for running over curves; that the trucks follow the curve, and guide the engine with greater facility and certainty, than the larger wheels of the former kind of engine, which, from the construction of the machine, have but a slight lateral motion, and consequently, incline to pursue a straight line. Upon this point, however, the proof is conflicting; and facts are stated by some of the witnesses, purporting to be the result of actual experiments, which tend to show, that the “Cumberland” had followed curves, which ordinary four wheeled engines, with trucks, had failed to do without running off.
*615 It is shown in the proof, that the “ Cumberland ” was procured for this particular service; and that it had been thus used for a period of two years, or more, before the accident referred to, without any complaint, so far as we learn from the record, that it was in any respect, unsuited to the service, or at all unadapted to any curvature of the road.
Upon the whole record — if the question of fact were open for our determination — we should hesitate to say, that the company -had been guilty of any such negligence or fault, either as respects the construction of the bridge, or the engine, as would entitle Elliott, as their employe, to maintain his action.
But, the facts have been settled by the jury, and if the instructions of the Court shall be found unexceptionable, we are not at liberty to disturb their verdict.
It should be stated, that the engineer who conducted the locomotive at the time it run off the bridge, and who had been employed in that capacity for some five months before, was examined as a witness for tire plaintiff. He stated, that the engine’s. running off, was not by reason of any negligence on his part, or of the other hands. He further stated, that, after the bridge was completed, he had run the engine over it, safely, five times, and in crossing the sixth time, it fell off: That there is a difference in running on wet and dry rails; that when the rails are wet, the friction is less, and “the engine will slip round the rail's more easily:” that in crossing the bridge the first four times, the rails were wet by rain, and the fifth time he wet the rails before crossing; but the last time, when the engine run *616 off, he omitted to do so, though the rails were dry.
Ia considering this case, it must be borne in mind, that the servant- of a railway company, who receives an injury while in the performance of the duties of his service, stands upon a very different footing from a passenger traveling on the train, as regards the liability of the company. Although railway companies are not held liable, as insurers of the safety of passengers, as they are, as common carriers of goods, and of the baggage of passengers, yet the rule,. in regard to the degree of care and vigilence exacted from them, as laid down in several cases, is an extremely rigorous one: They are held bound to .the highest degree of care and diligence, and are answerable for all injuries to passengers, resulting from the slightest negligence, or want of skill, or prudence: Redfield on Railways, ch. 17, sec. 1, and notes; 14 Howard’s R., 483.
But, as to the servants of the company, the rule is different. The servant, on entering into the service, knows, or is taken to know, that there are extraordinary dangers inseparable from such a service, which human care and foresight cannot always guard against: He is not bound to incur these" known perils, incident to the service, and may refuse to do so; or he may, as far as can be done, provide for them, in the rate of compensation, or otherwise. But, if he voluntarily engages to serve, in view of all the hazards to which he will be exposed, it is well settled, that, as between himself and his employer, he undertakes to run all the ordinary risks of the service; and this includes the risk of injuries, not only from his own want of skill or care, but likewise, the risk of injuries from the negli *617 gence of bis ¡fellow-servants. This doctrine, however, must be taken with the qualification, that the employer must take care not to expose the servant to any risk, by associating him with other servants wanting in ordinary skill or care; or by the use of unsafe or unsuitable machinery, or other culpable negligence: Ibid., ch. 17, secs. 1, 2, 8, and notes.
Having stated these general principles, we proceed to notice the exceptions to the instructions of the Court.
The Court, in substance, stated to the jury, that the company were bound to see that the road was in good order, and safe, and that the engines, &c., > were perfect, and properly constructed, according to the present state of the art; and also, to have competent and prudent engineers. That if the road and machinery were safe and perfect, and the locomotive by accident, run off the track, and caused an. injury to the plaintiff, the company, in the absence of any fault or negligence on their part, would not be responsible. But, if the injury was occasioned by an imperfection in the road or machinery, the company would be responsible for it: provided, the latter had knowledge of such defects, or in the exercise of ordinary care, might have known it. The Court further stated, that if either the road or machinery was defective, and that fact was known to the engineer, that would be knowledge on the part of the company.
It is supposed the Court erred, in holding that the company were bound to see to it, that their engines and machinery were perfect, and constructed according to the present improvements in the art. In support of this exception, we are referred to the note of a late *618 English case, cited in Redfield, 695, which holds, according to the note, that when an injury happens to a servant, in the use of machinery, in the course of his employment, it will not render the master liable, that he has in use in his works, an engine or machine less safe than some other in general use.
The facts of the case, to which this principle was applied, are not stated in the note; and all that need be said of it, is, that such a principle cannot be admitted as applicable to railway companies. The principle laid down in the charge, is sustained by several authorities. The general doctrine is, that in proportion to the importance of the business, and the perils incident to it, is the obligation of the company to see, that the engines and apparatus are suitable, sufficient, and “as safe as care and skill can make them:” 16 Barb., 353, cited in Redfield, ch. 17, sec. 1, in notes.
To be sure, if the engine in question, though not constructed according to the latest model, were shown to be safe, and as well adapted in all respects to the service, as one of more recent invention, of different construction, that would be sufficient. And the charge is not incompatible with this view: it assumes that the latter possesses advantages over the former, in regard to safety or otherwise.
The next exception to the charge, is, the principle stated by the Court, that the company was chargeable with knowledge of a defect in the road or machinery, possessed by an engineer in their employ.
This objection is not tenable. The established rule, that notice to an agent in the transactions for which he is employed, and within the scope of the authority *619 confided to him, is notice to the principal, applies equally to a corporation as to a natural person: Angel & Ames on Corporations, 299, 301.
In general, the only mode in which a corporation aggregate can act, is through the intervention of agents, either specially designated by the act of incorporation, or appointed and authorized by the corporation, in pursuance of it: Ibid., 256. And the corporation is responsible for the acts of the agent; and, of necessity, the knowledge of a fact, by the agent, directly connected with the duties of the business confided to his care, must be chargeable to the corporation: Ibid., 302, Redfield on R., 380.
The tendency of the course of decision is, to give the agents of railway companies a liberal discretion, and to hold the companies liable for their acts, within the most extensive range of their charter powers: Redfield on R., 380.
And it has been suggested, with much plausibility, that, in respect to corporations, the legal, entity should be regarded as virtually always present, in the person of any of the employes, within the range of the employment: Ibid., 384, 385.
The proof shows that the plaintiff, Elliott, was under the age of twenty-one years at the time of receiving the injury. It appears, however, that, at the time of entering the service of the company, he was the head of a family, having a wife and one child.
On the trial, much stress seems to have- been laid on the fact of the plaintiff's minority, as taking the case out of the operation of the ordinary principles governing Jhe liability of railway companies, for injuries to *620 persons in their employment. Upon this point, His Honor instructed the jury, that if the plaintiff was under the age of twenty-one at the time of his contract to enter into the service of the company, the contract “was void, and not binding on him, and would not place him in the attitude of an employe/” and “if the defendants took him upon their road to labor, and whilst there, by ike negligence of its agents, or defects in the road or machinery, the plaintiff was injured, the defendant would be responsible for it.” Such, his Honor stated to be the law, unless it were shown “that the plaintiff had a father living, and that he permitted him to act for himself;” that the father's consent to the contract would be necessary “to make him an employe” of the company.
This instruction, in the unqualified terms in which it is stated, is not correct. It is certainly true, that a father has the legal right to the ■ control and services of his child until he attains the age of twenty-one years, but it by no means follows, from this, that an infant is incapable, under any circumstances, of making a binding contract, without the express consent of his parent. It is well settled, that, notwithstanding the general incapacity of infants to enter into absolutely binding contracts, yet they may make some contracts which will be binding, at least until avoided by them — such as contracts for their benefit. The rule upon this subject, as laid down in Keane vs. Boycott, 2 H. Bl., 511, has been frequently approved by this Court: (See cases, 1 Meigs’ Dig., sec. 1116.) It is this: “That when the Court can pronounce the contract to be to the infant’s prejudice, it is void; and when to his benefit, as for *621 necessaries, it is good: and when the contract is of an uncertain nature as to benefit a prejudice, it is avoidable only at the election of the infant:” 2 Kent’s Com., 193.
A contract of apprenticeship, it is said, is generally to be regarded as for the benefit of an infant, and, therefore, he may make a legal, binding contract of apprenticeship: 4 Term Rep., 196; 5 M. & S., 257. So, it is held, a contract of hiring and service may be beneficial to an infant, and would, generally speaking, be binding upon him, and may be made even with his own father: 4 B. & C., 94; Smith’s “Master and Servant, 6, (Law Lib., 6th series, vol. 2;) 10 M. & W., 195.
This doctrine is not to be questioned. It’does not, of course, counteract the father’s right to the services of his infant child, or his right to reclaim the custody and services of the infant, who may have hired himself to another with the parent’s consent. But, it is clear, that, as between the infant and the third person, the contract of hiring and service is not rendered inoperative and void, on the part of the infant, merely for want of the previous consent of the parent. It remains binding until avoided by the infant, or until the parent asserts his paramount right to put an end to it, by reclaiming his minor child.
Hence, it follows, that the plaintiff, by his contract with the company, so long as he assented to it, was as fully in the condition of a servant or employe of the latter, as if he had been of full age.
The charge being clearly erroneous, in assuming that Elliott did not stand in the relation of servant to the company, we need not stop to comment on the different *622 measure of liability supposed to rest upon the latter, on this mistaken assumption.
There is another matter in the case which deserved to have been submitted to the jury. Assuming it to be true, as the proof tends to establish, that an engine of the construction of the “ Cumberland,” was, in all respects, better adapted to the special service for which it was procured and used, namely, pushing freight trains up a heavy grade, than any other kind of engine yet invented, except in the singular particular of not following ■ a curve with as much facility or safety; and assuming, also, as the testimony of the engineer would seem to warrant,) that this difficulty might have been, in whole or in part, obviated by wetting the rails. Now, if the engineer, whose duty it was to have taken this precaution, if necessary, neglected to do so, it would have been a proper inquiry for the consideration of the jury, whether this negligence of the engineer caused, or contributed to, the running off the engine. And if.this were so, the case would be governed by the principle before alluded to — that where several servants are employed in a common service, and one of them suffers an injury by the neglect or want of care of another, while they are jointly engaged in the same service, he cannot recover against the employer for such injury, in the absence of any fault on his part, because the injury was occasioned by the negligence of his fellow-servant, and not of the employer — the hazard of injury, not only from his own want of proper care and vigilance, but on the part of his fellow-servants, also, being one of the risks which, as between himself and employer, he is supposed to have taken upon himself by the contract. The case, *623 however., in this aspect, was not submitted to the "consideration of the jury.
If it were impossible for the company to procure an engine exactly fitted for all the purposes in view, then it was their solemn and imperative duty to select one of such model as, on the whole, would be safest, as respects human life. To this consideration, all others must be made to yield, at whatever sacrifice in a pecuniary point of view.
For the error in the charge, in regard to the effect of the plaintiff's minority, we feel constrained to reverse the judgment, and award a new trial.